The next case for argument is 20-1664, Intel Corporation v. Qualcomm. Oh, you're ready already. Good morning. Please proceed. May it please the Court, Greg Lanthier on behalf of Appellant Intel. In the IPR below, the Board made three separate errors, each of which requires reversal or remand. The first error is found at Appendix Pages 15-18. The Board was required to apply the broadest reasonable interpretation standard in this IPR, but instead of doing so, the Board issued an improperly narrow claim construction of the claim term radial frequency input signal. Its construction imported a limitation from the disclosed embodiments in the patent and is contrary to the scope of the plain ordinary meaning of that claim term. That claim construction... Yes, so can I ask you about that? Of course. And I think maybe you all conceded this to the Board in the oral argument to the Board. Your construction of radial frequency input signal seems to render the word input entirely superfluous since the words that follow say exactly what that signal is going into. So that that at least seems to me to mean whatever else is going on here, you don't have a plain meaning, and maybe even you have a suggested meaning that it means something other than any radial frequency signal that is going somewhere, at which point you then turn to the spec not for disavowal, but to understand how that phrase is used. And tell me if I'm wrong about this. Every single time it's used, it's used to refer either to the thing coming into the antenna or to the thing coming out of the... LNAs. What's the N for? Low noise. Noise. I always forget that. The low noise. And it actually at least twice uses that phrase to refer to what's coming out of that also. That's correct. So why doesn't that mean that really that's the only reasonable interpretation? I think it's important to start with the claim, Your Honor. The claim is at appendix page 90, and the relevant claim is claim 17. It has three parts, and it's directed to a method for increasing gain in the mixer. Part 17A says we're going to receive a radial frequency input signal, and part 17B says we're going to output a signal at baseband. That's really all the claim is talking about when it discusses the radial frequency input signal. It's juxtaposing it to the output, which is at baseband. And so it is not the case that our construction reads the word input out. It has to be the input signal. It has to go on to the source of the first transistor. I'm sorry. What significance are you giving the word input? It has to be an input that is on the source lead of the first transistor as opposed to an output. And if the word input were not there, how would that fail to be true? Your Honor, I think it would still be true. However, the reason I raised the claim is because the structure of the claim, claim 17, is just saying first we have an input and then we have an output. Because it's written from the perspective of the mixer, it has to receive the input and then you output at baseband. And that's all. The claim doesn't say anything about an antenna. It doesn't import any significance to what that input signal is other than it has to be at a radial frequency, and then the output has to be at baseband. That's all that the claim requires, and that's all the claim discusses, Your Honor. And I think what happened here, where the board went wrong, is it started with a distinction between the prior art reference DARE and the preferred embodiment. And that difference is that DARE is a superheterodyne mixer and the preferred embodiment is a homodyne mixer. And it's true that every single disclosure in the patent that illustrates the invention is a homodyne mixer. Suppose I, for purposes of this question, thought that this discussion of homodyne, superheterodyne was kind of beside the point. Why isn't the rationale that I was laying out, nevertheless, a freestanding one? Namely that the claim language, you've got to give meaning to input, particularly if you're talking about from the perspective of the mixer, and you're now adding, what does the mixer see? Not the mixer. Yes, the mixer. What does it see? What's coming in that it's about to receive? And it then uses a phrase that is uniformly in the spec used to refer to a signal with the same frequency of what's coming into antenna 16. I think, Your Honor, that that would be placing undue emphasis on the word input. This is similar to the Comcast case, which we cite in our papers, where there was some different claim language used to describe similar concepts in the board, and Your Honor said don't overread the claim under the broadest reasonable interpretation standard to narrow it based on that wording. You have to read the claim in context and understand what this claim is to. Remember, the inventive aspect of Claim 17 is all in 17C. It's all about how the circuitry is connected in order to perform this step gain mixing. There's nothing in the patent that suggests there's anything novel or important about the radio frequency input coming from the antenna as opposed to being the second stage of a super heterodyne mixer. But this whole discussion, I think, reflects the concern I'm having, which is under principles, whether we're talking about BRI or whether we're talking about our Thorner line of cases about broad construction, the predicate for applying it is that there's really truly a plain and ordinary meaning. And even the discussion here reflects that we're looking at the claims, we're looking at the specification, and there is no plain and ordinary meaning, including for the word input, without looking and reading it in the context of the specification. And it's not helpful to your side to rest on the specification, as you note, because the specification is all embodiments and is all discussion of the construction adopted by the board. So you want to respond to my concern? Yes, Your Honor, and I pause at the starting point, which is to say that there's no plain and ordinary meaning of the term radio frequency input signal. The plain and ordinary meaning is it's a signal that's input at a radio frequency as opposed to at a baseband frequency or microwave or other frequency range. And this was all, everything you had on this was an expert, not dictionaries, not treatises, not any of that, but your expert testimony on that. That's correct, Your Honor. We had Dr. Fay, and he testified to this. But I don't think you need to get to expert testimony to appreciate that the term radio frequency input signal has a plain meaning. It is an input signal that is at a radio frequency. The second error that the board made, Your Honors, is found at appendix pages 52 to 51. Can I just ask you about that claim one more time? Of course, sir. Is what you're saying basically is we should look at 17A and B and understand they're basically kind of parallel structure. You get a radio signal in, which is an input, and you send the baseband signal out, which is the output. And they're not in strictly parallel language because one says receiving an input, whereas the other says just outputting. But it could say sending a baseband signal output. So then you would have strictly parallel receiving input, sending output. Is that what you're saying, that this is the way we should view this? That's exactly right, Your Honor. So in that example, input doesn't have kind of a specific kind of coined meaning for this patent. It's just input. Correct. It's the input to the mixer. This is a patent on a down-conversion mixer, which means that you're taking in signal at a high frequency and you're down-converting it to a lower frequency. Here, you have to down-convert it to baseband. That's the requirement of the claim. I know you want to get to issue two. I want to ask you a quick question. Your Honor, I'd rather answer your question. I have a question about issue number three. I guess it's about the substitute claims, whatever they're called. That's correct, Your Honor. 2831. The board, and I think I'm remembering this right, that you'll correct me, gave something like three reasons for saying you hadn't made your case against that. If I thought that the first two were not sound, namely the efficiency is too general an idea, and then there was one about why would you be looking in Bergner at what Bergner describes as the prior art as opposed to Bergner itself, but nevertheless thought that rationale number three had something to it, do I nevertheless vacate and remand because even if three is the board's criticism on the third ground is sound, numbers one and two might suffice to sustain your challenge, and we don't know that. That's correct, Your Honor. I think that the board's analysis has to be read in full, and that if you agree with us that the board improperly discounted the power savings motivation, then the appropriate course is a remand. We wouldn't be asking for outright reversal, but the board should apply the correct legal analysis, and so a remand would be appropriate. The second error I just want to touch on briefly, I know I'm getting into my rebuttal time in about 45 seconds, was that the board in finding that there was no obviousness for claims 6, 17, 19, 21, 27, 28, and 31. Is that the Dare and Bala combination? Yes, Your Honor. This is Dare and Bala, and what that is is Dare undisputedly discloses the circuitry that is claim convention in the patent. The only fight on whether Dare meets the independent claim here is about whether the claim construction was right or wrong. Bala discloses what are called passive mixers. There are two different types of mixers. You have active mixers. They consume power. You have passive mixers, which do not consume power, and the obviousness combination here was very straightforward. The references all talk about power savings as an important motivation, and the expert testimony was, of course, if you wanted to decrease power consumption, you could use passive mixers from Bala as opposed to the active mixers from Dare. Sure, but I get that. We're on a substantial evidence review, right, and the board specifically explained that you wouldn't combine Dare with Bala because Bala had some kind of low impedance value and that it would conflict and not work, and why isn't that substantial evidence for the board's conclusion? Your Honor, we disagreed with that below, but we are not challenging. You're doing a weighting thing. Your main challenge here is that they considered the harm but not the benefits. That's correct. I didn't mean to interrupt Judge Hughes, but just following up with his analysis, in a way, I read it under a substantial evidence review as kind of weighing the benefits and the costs simply because they said the low impedance would be lost in most operating conditions, so they were weighing all the circumstances, so I, like Judge Hughes, am a little skeptical about why substantial evidence doesn't support the conclusion. The issue isn't the finding about the one disadvantage. The issue is that the board never acknowledges that there would be at least three advantages or benefits that would have been known to a person of skill in the art of making this combination, and it doesn't perform a weighing. We're not saying that there has to be some tremendous amount of analysis, but what the board did was it found one disadvantage that applied in two out of three modes, and then it ended the analysis at that point. I think it sounds a lot like the argument we heard from the other side in the last case, is we know what the board said, and we know that they said you wouldn't combine these because the one reference suggests that you wouldn't because of whatever the reasons they gave. These technical words I trip up over, so I'm not going to even try to say them, but we know what their explanation is, then we go look in the record. Is that supported by evidence? And their expert said yes. And I don't know. I mean, yeah, you don't like their reasoning, but why isn't that substantial evidence? I think this is very different from the argument you heard a few moments ago in the other case because we're not saying that the board failed to articulate its reasoning. In fact, the board did a good job here of articulating how it got from point A to point B. So were you saying there's no substantial evidence to support the board's decision? We are saying that the board applied the incorrect legal analysis for obviousness here because the board found that there was one disadvantage, and then it failed to weigh that disadvantage, which only applies sometimes, not in every mode, against the benefits. And so the board had to say. We're not making a substantial evidence challenge. No, you are. We're not. We're challenging the legal evidence. Well, I mean, I guess this is all in the weeds, but one of the benefits you're saying has to do with linearity, right? I'm not sure I understand it. Correct. And I think the board or somebody, maybe the other side's expert, talked about low impedance that was related to improved linearity. So at least with respect to that one benefit, I think that was kind of consumed in the board's analysis of low impedance, right? Am I missing something? This is a detail, but it's an example. Yes, Your Honor. I think that it's not in the board's analysis, and that is the problem. The disadvantage, the board made no findings about how significant that disadvantage was as compared to the advantages, and all we're asking for is the board to take into account the totality of the facts on motivations to combine and analyze whether the disadvantage is so Just to be clear, if we don't find that the board applied the incorrect legal test for obviousness, you're not saying their conclusion lacks substantial evidence? That is correct, Your Honor. Okay. Okay, you've used your rebuttal, but we'll restore some time. Let's get to the other side. Thank you. Mr. Franklin. Thank you, Your Honors. May it please the court, Jonathan Franklin for the Pelli Qualcomm. I will address the issues that the court had that caught me with the opposing counsel, but I do think it's obligatory on my part to first start with Article III standings, since that is a threshold issue in every case. And in this case, Intel has the burden of proving standings, and did not put forward evidence showing that it has a concrete, non-speculative, and imminent threat of an injury. Well, you don't dispute that you've previously asserted the same patent against an Intel product, right, in your litigation against Apple? We asserted the patent against Apple and a product that Apple made. I would say that there's nothing in the evidence of this particular case that shows that that particular patent lawsuit, Intel's not mentioned in the complaint. It was not an Intel product? Well, there was an Intel product involved in the Apple iPhone at that time. But that was a lawsuit that was filed almost four years ago, settled more than two years ago with Apple receiving long-term rights to the patented technology. Intel's argument is that it has, for the last four years or almost four years, faced an imminent yet somehow unrealized threat of an enforcement action by Apple, not even communicated with Intel about this particular patent. I would like to just briefly return the court to the declaration that Intel submits. It's very easy to find because it's the last page of the joint appendix. This is just to show your honors how speculative Intel's allegations truly are. The last page really is 4796. This is the only declaration that Intel put in from any of its employees about anything in this case. And what it says is at the top of 4796, it has Intel's continued and will continue to supply smartphone modems to Apple for prior versions of iPhone that Apple continues to sell and it does sell to other customers. It sells nothing about what they're currently making, what they're currently selling. There's no statement about any particular product. There's no statement about what phones Apple is or isn't selling. This is the kind of evidence that the court in Apple versus Qualcomm, they referred to those declarations as quote, the sparsest of declarations. I would say this declaration is equally sparse. And then we have the last statement and this is really the only statement that refers to the 043 patent in any declaration that they put in. And that's also on 4796. And what it says is at the end, to mitigate concerns of infringement accusations, Intel may, and I emphasize the word may, need to invest in designing its transceivers differently, which would divert resources from other operations and research. Again, they don't point to a single product that they're currently making that even they or Qualcomm would contend infringes the 043 patent. They don't point to anything that's in the design process, such as in GE. They don't point to anything that they're contemplating. They just say they may need to invest in designing. And that's, I think the definition of the speculative assertion. So for those reasons, we would say that Intel has not carried its burden and it has the burden of proving standing in its opening brief through declarations that are actual evidence that would suffice in court. Now, having said that your honors, I will, I will address some of the merits issues that the court did get into with the other side. But we do think that in the first instance, the proper resolution of this case is simply to do what the court did in Apple versus Qualcomm. And that is to dismiss the case for lack of standing. There is no imminent harm here. And more importantly, Intel has not proven through a declaration or any other admissible evidence that there is such an imminent harm. And I would also add by the way, your honor, that the record on this is closed. Let me just ask you one question. In the Apple suit, did you assert that the Intel product satisfies all of the limitations in any patent claim in this patent? I was not counsel in that case, your honor. It is my understanding based on secondhand information, not based on anything that's in the record of this case. And that's important that there was an Intel product that was accused in that case. But like I said, I wasn't counsel. You can't find that in the record of this case. You can look through the complaint all you want and you won't find a single reference to Intel. So what I'm telling you now is just based on what I was told by somebody who was counsel in that case. You mentioned also that they didn't refer to any particular product and maybe I'm not understanding your point or whatever, but at 46 of blue they are talking about a particular product. Yeah, that's in their brief. That's no more than what a counsel could say in court. I'm talking about what they said in their declaration, your honor. And there is no specific product mentioned anywhere in that declaration. That is the only declaration by any Intel employee in this case by Mr. Duncan Kitchen. And it was put in the motion to dismiss phase. It's three pages long. I read to you from the last page, which is really the only relevant page. And no, he doesn't mention any specific product. The product that's mentioned that you say is in the blue brief comes from Intel's counsel. I think I'm looking at the right thing. So in the Intel's opposition to Qualcomm's motion to dismiss the appeal, there's an exhibit two that refers to, I think, several very specific products. The RF transceiver, which I guess is the one relevant here. And on the previous page, the baseband processor. That is correct. And maybe I'm being overly procedural here, but that motion was denied without prejudice to the parties raising standing in their briefs. And under Figenics, they have to support that with appropriate declarations. So what your honor is referring to comes from a motion to dismiss that was denied. And yes, in that motion to dismiss that, that evidence was put forward, but not in this case. And I don't remember, did Intel in its standing section of its brief make some, I'm just going to call it an incorporation reference. They might have referred to their motion to dismiss, but you can't incorporate prior reference. I think at this point I would move briefly to the merits, but your honor is correct about what you're saying about the motion to dismiss papers. What I am talking about is what's in the briefing and in the argument and in this case, which is what this court decides, because the motions panel said motion to dismiss denied, renew your standing in your open brief. And under Figenics, that's where they have to put it all in. And they didn't. Okay. I assume you're going to turn to claim construction. I will. I will. And I think I will turn to claim construction. And Judge Toronto, I think we agree with your analysis and I would add only one thing to it. And that is not only does the patent exclusively refer to the radio frequency input signal as what the board construed it as the frequency at which the antenna receives it, but the patent also distinguishes between radio frequency input signal, which it refers to as the RF signal and something that's known as intermediate frequency. But the answer to that is the RF includes or consumes the IF. Not necessarily, Your Honor. And that's I think the point here is that there is no one plain language meaning. We know that from their own expert, we know from their own textbook that they put in that RF and IF have different meanings in different contexts. So in the context of a transceiver and particularly this one, RF refers to the frequency at the radio frequency that is then input into the transistor leads. Whereas IF is something different and their own experts said that. So you can see that in the board's finding too. The board says the patent distinguishes between those two things. Their own experts said that. So you have at 1012 paragraph 28, you have their own expert, Dr. Fay distinguishing between the down converted RF signal, which is then put into the IF signal. And that's 1012. And I think it's paragraph 28 or 98. And then you have, and that's 28. And then you have Fay's deposition, the same guy that's at 2975, 2988. He distinguishes between RF and IF. And then you have their textbook. They put in a textbook. This is Intel evidence at 1206 and 07. This is a textbook that says that distinguishes between RF and IF. So what we're saying, Your Honor, is in some contexts, in a general sense, you could use the word RF to refer to what they're saying. But what the question is, is how is it used in this patent, in this specification? There is no one single definition. And the way this one, this particular patent uses it, is exactly the way the board construed it. As Judge Ronda pointed out, every single time in the patent where the phrase radio frequency input signal is used in the specification, it is referring to the frequency at which it is received by the antenna. And then you have the additional point, that there's a distinction drawn in column 10 between RF and IF. Do you have any specific comment? We spoke a lot about the language of Claim 17. Yes. I don't think the language, I think the language of Claim 17 is what the board construed. And I guess to address Judge Hughes, your point, I think the input and the output are not necessarily material to this. The question is, what is radio frequency input signal? And that is clearly defined or used in the patent in only one way. And in a way that distinguishes between IF. They would say, their argument is that the RF input signal includes an IF signal. That's their argument. And the patent distinguishes between the two. Claim 17 is claiming an initial. It's a down conversion. Would your argument change if instead of it said, receiving a radio frequency input, it said inputting a radio frequency signal? So that it was exactly parallel to the outputting portion? I don't think our argument would change. The specification might be changed because they would have to refer to it in the different terms that the claim used. You're saying the claim language changes. Instead of saying receiving, I don't have it right in front of me. So if I'm getting it wrong, I can pull it back up. It says something like receiving a radio frequency input signal. Right. So instead of that, it said inputting a radio frequency signal. So it takes the word input out and just refers generically to radio frequency signal. I think you said inputting a radio frequency signal. Yeah, inputting a radio frequency signal. So it would use the word input also. Yes, but the other one uses output in terms of like a gerund. The B is outputting a baseband. I think what you're trying to say is when they put the word input into radio frequency signal, that specifies a specific type of radio frequency signal. But if we take the input out of the – and I don't want to get all grammar rules here because I haven't looked at that since high school. But if it's not part of that, instead if it's just showing the action, and then you just have radio frequency signal, that doesn't seem to have the specific meaning you would ascribe to it. Well, I think then we'd have a different pattern, but we'd also have to look at what the specification says. So my question to you is was the choice to not make those parallel obviously intentional in that you were establishing radio frequency input as a coined term for this pattern, rather than just making them parallel functions of inputting and outputting, which is – It is a coined signal, and you have to look at the entire specification – Well – A coined term, excuse me. And you have to look at the entire specification in every single place. And I could cite them to you if you want, but I could also go through – there's a couple of other issues that were addressed that I'd like to get to. But every single time that the radio frequency input signal is used in the pattern, it is used to refer to signal 32, which is the signal receiving the antenna. And that's what the board said. Every time it's used this way, it's only used in this way. It distinguishes between RF and IF. Just for – Does it distinguish between RF and IF? Yes. Or just – It does. It doesn't – that radio frequency input signal does not cover IF? Not in this pattern, no. It distinguishes between – No. Is that what you're saying, that the specification specifically says a radio frequency input signal excludes an IF signal? Well, it distinguishes between RF. So it's on 84, paragraph 84, line column 1, 11 to 14, it says – refers to mixers that preamplify incoming signals and down – I'm sorry. Can you give me the site again? 84 at column 1, lines 11 to 15, it refers to down-converting the signals, the radio frequency signal, to an appropriate intermediate frequency, IF, or baseband frequency. And this, plane 17, is referring to a down-conversion of an RF signal to a baseband frequency, not to an IF. I'm sorry. You're saying this suggests that RF doesn't include IF? Yes. They talk about IF being a down-converted from RF. But it doesn't even mention RF in this. In the – it talks about the incoming signals. So it's a preamplified incoming signal. Is this the best you've got? That's what the board referred to, yes. Okay. Incoming signals are RF signals. And just – I'm running out of time. Let me just say something. Yeah. We're going to add another five minutes. Okay. My colleagues don't object to your time because I know we're going to have to add a corresponding amount of time for the rebuttal. I appreciate that, Your Honor. So don't – I appreciate that. I'm sorry to rush on this. But, no, that does – the incoming signals at that point are referring to the RF signals. And the rest of the paragraph makes that clear. And that's what you think is clear enough to consider this a coin definition for radio frequency input? That plus every time they use the term radio frequency input signal in the patent is referring to the frequency at which it's coming through the antenna. But there's nothing else that specifically says one is different from the other than that. The only place where they talk about the difference, that's at column one, yes. But it is an important difference because they're claiming this is not a super heterodyne system. This is – 17 is not claiming a super heterodyne system. So then we have the – Judge Toronto, you talked about the alternative findings on the last issue. I mean I think they were alternative findings that the board made. And so what the court can do is – Well, how exactly are they alternative? I mean the challenger says here's one motivation, here's another motivation, here's a third motivation. And the board says first one, no. Second one, no. Third one, no. So if the board erred as to the first and second, how does the third save it? Because they were alternative. I view them as alternative findings, Your Honor. So the first one was that disabling DER's – what DER referred to as an important variable gain mixer to save power was just a generic motivation. That's not a specific motivation to combine. That's number one. Can I ask about that? I mean in some sense it's kind of the core of Qualcomm's business to find new ways of saving power in these tiny devices. How is that somehow too general in this line of work? Because you could turn off anything and any device and it would save power. So the question is why would you turn off what DER describes as an important variable gain mixer? The motivation to save power is a motivation to do pretty much anything that would turn off or save power in the device. It doesn't point you to this specific combination. But even if – again, I'd say these are alternative rationales because the next thing they said was there was a signal feed-through problem. So what they're saying is you have to turn this off and then that's going to create another problem. It's admitted that it creates a signal feed-through problem. So again, one would not be motivated to do something that would then create a problem that didn't otherwise exist. Then they say you would then solve that problem by using a transistor from Bergener as a switch. But Bergener describes that transistor as inferior to the transistor that Bergener itself describes. I think Intel stated in its brief and you didn't, I don't think, reply. Maybe this is because this was not a point disputed or argued to the board. It said in its brief even the Bergener solution to the prior art has the same drain or whatever the thing that's being added. What do I make of that? If that's true, then this distinction between Bergener describing what's in prior art and figure whatever is one or something and Bergener's solution as to the drain idea, is drain the right term? Drain idea makes no difference at all. But the point is what was one skilled, again we're on substantial evidence. Was that a point argued to the board? Not to my knowledge, it may have been, I'm not sure. But I think that we're on substantial evidence review in this regardless of what they say about the second part. The third part is clearly substantial evidence motivation to combine. And in that, all of those grounds that I referred to are alternative grounds. So if one were not motivated because Bergener says don't use this switch, we have a better one. So a skill in the art would look at Bergener and say, ah, Bergener's telling us to use this switch, not the other one. And what the board found is that that would not be a motivation to combine. And again, we're on substantial evidence. It only needs something that would be reasonable. What was the third? And can you give me the page? I'm forgetting what the third rationale was for the board. Okay, so the board's discussion of this would be, the last one would be that the proposed combination would result in a device not suitable for its intended purpose. So the board's discussion on all of this is on pages 65 through 67 of the opinion. And it says, nothing in DERS suggests turning off any part of the functional circuit elements, let alone the important variable gain mixer. I'm reading here from 67. Because turning off DERS variable gain mixer would result in a device not suitable for its intended purpose, petitioner has not shown that a person of ordinary skill in the art would have modified DERS in the manner suggested by petitioner. That's another alternative graph. And so all of these are alternatives, Your Honor. So if you have questions about one of them, any of the other ones suffices. The last thing I would point is that Judge Prost, you're absolutely right on the second issue. When you talked about your being in the weeds on it, but it's actually quite, I think, an important point. Their argument is the board never considered certain benefits such as— You're talking about the VALA. I'm sorry, the DERR VALA. Yeah, I'm going back on the second one. But Your Honor pointed, and I think that the right page actually is 52 of the board's decision, 52 to 53. And what the board found is the benefits that they're talking about, specifically low noise and improved linearity, those benefits only come from the low impedance. And so when you've destroyed the low impedance, which everybody agrees would happen with this combination, you've destroyed those benefits over the vast majority of operational circumstances of this. So you were in the weeds, but you're absolutely correct in what you said, and that is the benefits were considered. They were balanced against the drawbacks, and what the court found is that the important drawback— The very first paragraph of VALA says the key feature is low impedance, and we know that by combining it in the manner that they are combining it, you are destroying the low impedance. And the board said Qualcomm argued that, Intel didn't dispute it, and those benefits that they say the board didn't consider actually don't occur with the low impedance. So again, the board did consider them. All right, thank you. Thank you, Your Honor. All right. So I think my math is right, and I think we will give seven minutes for rebuttal. If you—only if you need it, but thank you. And you want to start with standing, I'm sure. Yes, Your Honor. I'll start with standing, as Your Honor asked. The argument I heard on standing was focused, I think, on the declaration of Duncan Kitchen, who was an Intel employee. It's not the case, though, that that was the only evidence of standing that's in the record that is cited here. Appendix page 4785 demonstrates that there is a company called Vibocon that is selling the same exact product that Qualcomm accused of infringement. I'm sorry, 47— 4785. 85, thank you. The same exact Intel product that Qualcomm accused of infringement in its case against Apple. Qualcomm has never contended that Vibocon has a license to do that. And so we're in a situation here where Qualcomm— I'm sorry, and what is the relationship between Vibocon and Intel? Page 4785, Your Honor. You see in the first sentence that Vibocon is selling a Netcom module developed based on Intel's 7360 platform. And that 7360 platform has the Smart E5 transceiver chip, the Intel Smart E5 transceiver chip. I realize this may be ridiculous, but how do we know that Vibocon doesn't have a warehouse of fully paid-for units? It's selling them. Intel's got its money, couldn't care less whether Vibocon— or is this a—are you supplying them to Vibocon on an ongoing basis? Yes, Your Honor, and that's what the Dunkin' Kitchen declaration states at page 4796, that Intel is continuing to sell these smartphone modems to other customers. But the question I'm having is that I think that your blue brief, which addresses the standing question, and I haven't looked back at gray, but blue is 36 to 40, if I'm correct, or 36 onward. And I don't see the citation to that portion of the record. There's—right? Am I looking at the long brief? Where are your—in your argument on this issue, in your brief, 36, right? Or no? Yes, Your Honor. I think you are right about the blue brief. 46. 46, yes. However, in the— Do you cite to that anywhere, to that portion of the transcript anywhere in this analysis? We do, Your Honor, at page 28 of the reply brief. Okay, good. All right. Thank you. I did represent Intel in the district court in connection with the lawsuit that was previously brought. I also submitted a declaration in connection with this appeal, which I think is an additional declaration. But the fact is that the only thing that was accused of infringing the 043 patent was the Intel Smarty 5 transceiver chip in that litigation. So under this court's standing case law, the test is whether Intel has or is in the process of taking some action that could subject it to a claim of infringement. Here, we have ongoing sales of a product that was already accused by Qualcomm of infringing the 043 patent. It's a very clear case for standing. Under Adidas, under the GED Raytheon case, it's not even that Intel is planning on doing something that would give rise to a possible infringement suit. Intel is continuing to sell the same exact product that Qualcomm previously said met every claim element. Does either your blue brief or your gray brief refer to the materials attached to the opposition to the motion to dismiss? So to some of the materials, yes, Your Honor. To exhibit to, the answer is no. However, those materials are in the record. It's before your honors. You can see that there's a teardown analysis showing that the inside of the Apple iPhone had this Smarty 5 transceiver chip, as Your Honor pointed out. Exhibit 2 also identifies a number of products. But I think that the important thing here is that cited in our briefing is reference to the Fibrocom product that has the Intel Smarty 5 chip. I do mean the gray brief, Your Honor. Yes, I mean we referred to it without a citation in the blue brief. That was our whole argument was that we were making these sales. But we did not include the citation to the page until the gray brief. I don't want to take too much time, but if you could just speak for 30 seconds on this question of the alternative uses with regard to the motivation to combine on the third issue. Where if we disagree at a minimum with the board on one and two, why we still have to remand it and can't go with argument three, assuming we would agree with that. Two reasons, Your Honor. One is, as I think Judge Toronto explained well, the board's analysis has to be read in its completion. And what the board did was started with an incorrect legal proposition, which if corrected, could have influenced or changed the outcome of the board's ultimate conclusion that there was no reason to combine these references. And so a rematch is necessary. The second reason is that the board's finding is just factually unsupported. What the board said is that third rationale was that incorporating the shunt switch in Berganer would have destroyed the use of DARE. That's not true. The argument wasn't that we were going to turn off the active mixer all the time. As Qualcomm's own expert admitted, DARE describes that the active mixer will be nulled in certain occasions. And the argument was just that for those occasions, it could be turned off to save power. Very straightforward obviousness. So in our papers, the second point, Your Honor, is a substantial evidence point. But there is no substantial evidence that turning off the active mixer in DARE when that mixer is not being used anyway would destroy the purpose of the reference. If that were true, that might, in fact, make it immaterial whether the board erred on rationales one and two, because if reason number three was so strong as to make clear that no matter what one thought about one and two, nobody would ever do this. I agree, Your Honor. But I do think if that were the case, though, I think the board would still have to acknowledge that it's weighing the other benefits against this detriment and saying, but this detriment is so significant that it outweighs the other benefits here. But I agree, Your Honor. If it were true that it would destroy the purpose of the circuit, which it's not, then that would be a significant detriment and would factor in differently. Your Honor, the last thing I would say, and this is really to Judge Hughes and Judge Prost, just goes to a couple of your questions on the claim construction issue. Your Honors can reread it for yourselves, but the one sentence in this patent at column one, lines 10 to 14, that Qualcomm is relying on doesn't say anything about a radio frequency input. It doesn't disparage the use of superheterodyne mixers in any way. It simply cannot support a finding that this patent is supposed to be limited to only homodyne mixers. The discussion of intermediate frequencies is – it really is orthogonal to the issue here in the claim. I guess – I don't want to belabor this point either, but I guess the question for me is when they use that forward combination radio frequency input signal, were they intending to signal – sorry, I didn't mean to make a pun. I hate puns. I don't even know if that's a – were they intending to denote a somehow term of art? And if that's true, then we have to look to the specification, and it doesn't have to be disclaimer or anything like that. We just look at the way it's used, and I think they're probably right. Or is – if we look at that, it's still just using – intending to identify a generic radio frequency signal as an input. And if it's that, then there's clearly not enough to define it. I'm still – I don't understand how – what's the dividing line between can we look at radio frequency input signal in the claim language and say that's either plain language and has a certain meaning that has to be overcome by something in the specification, or it's not plain enough, and then we interpret it in light of the specification? Yes, Your Honor. So it is the latter, the latter circumstance. What we have here is there's an item in the patent, item 32, that is referred to as the radio frequency input signal. And the patent only discloses one embodiment. It's homodyne mixer. So every time it refers to that, that's the same signal as what's coming off the antenna. But to Your Honor's question, if there was something in the patent that discussed the radio frequency input signal and that it was somehow important or relevant to the invention, that that signal be centered at the same frequency that it was received on the antenna, then I think we would – going down the path Your Honor was suggesting where you'd say, okay, well, this is being used as a term of art. It may not be defined. It doesn't have to be defined. But there would be – there's at least some discussion in the specification about why it's important that this frequency be the same frequency as was received by the antenna. But what – our entire argument on claim construction here is just that the board erred because what it did was import a limitation from the preferred embodiment into the claim. And that's not required. Thank you. Thank you. We thank both sides. And this is –